UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SIMON SCHATZMANN, JOHN MESSINA,
and JOHN LEZOTTE,

Plaintiffs,

-v.-

HARRIS PARTNERS LTD., HARRIS TRUST
PARTNERS LLC, and EDWARD P. HARRIS,

Defendants.

---

21 Civ. 7301 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiffs Simon Schatzmann, John Messina, and John Lezotte (together,

"Plaintiffs") were each hired in 2020 to work as a regional sales executive for

Defendants Harris Partners Ltd. and Harris Trust Partners LLC (together,

"Harris Partners"), both of which entities were controlled by Defendant Edward

P. Harris ("Defendant," and together with Harris Partners, "Defendants").[1]

---

[1] This case was randomly assigned to the Court after its filing. (*See* Case Opening Initial Assignment Notice dated September 1, 2021). After the case was filed, the Court came to realize that Defendant Edward P. Harris had, under the name David Wagner, been a defendant in several civil cases over which the Court had presided. *See, e.g.*, *SEC* v. *Wagner*, No. 19 Civ. 5570 (KPF); *Wesley Holdings Ltd.* v. *3si Systems, LLC*, No. 17 Civ. 3362 (KPF); *Kiderman* v. *Downing Investment Partners, LP*, No. 16 Civ. 4040 (KPF). Broadly speaking, the latter two cases involved allegations of fraud committed by Harris/Wagner and others through a different set of corporate entities that included Downing Partners, LLC, Downing Health Technologies, LLC, Surgical Safety Solutions, LLC, Surgical Safety Solutions Interactive LLC, and 3si Systems LLC. The SEC enforcement action involved allegations of investor fraud and misappropriation of investor funds by Harris/Wagner and others in connection with a subset of these entities (the "Downing Entities"). Separately, Harris/Wagner pleaded guilty to charges of securities fraud and wire fraud arising from his management of the Downing Entities, for which he was ultimately sentenced in January 2021 to an aggregate term of 72 months' imprisonment. *See United States* v. *Wagner*, No. 19 Cr. 437 (AKH). It is the Court's understanding, garnered from the cases over which it has presided, that Defendant's birth name was Edward P. Harris, and that he thereafter legally changed his name to David Wagner.

According to Plaintiffs, despite working for Harris Partners for a period of months in 2020, they were never paid for their work.

Plaintiffs filed the instant lawsuit in August 2021, making claims under federal and state wage-and-hour statutes, as well as common-law contractual and quasi-contractual theories. The two Harris Partners entities have failed to appear in this action and are currently in default. Defendant Harris filed an answer with counterclaims, asserting that the arbitration provision contained in each Plaintiff's employment agreement commands arbitration of the instant dispute. Plaintiffs have moved to strike or to dismiss Defendant's counterclaims, while Defendant has moved to dismiss the action in favor of arbitration. For the reasons set forth in the remainder of this Opinion, the Court denies Defendant's motions to dismiss and to compel, grants Defendant's motion to stay this case during the pendency of arbitration proceedings, and denies as moot Plaintiffs' motions to strike and to dismiss.

## BACKGROUND[2]

### A.    Factual Background

Each of the three Plaintiffs was hired in May or June 2020 to serve as a "Vice President of Sales" for Harris Partners, after responding to a job posting

---

[2]    This Opinion draws its facts primarily from Plaintiffs' Complaint ("Compl." (Dkt. #1)), the well-pleaded allegations of which are taken as true for purposes of this motion. *See Morrison* v. *Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 679 (2009). The Court has also considered the offer letter sent to each Plaintiff by Harris Partners concerning the terms of his employment (collectively, the "Offer Letters" (Dkt. #62 at 5-16)), which letters are incorporated in the Complaint by reference. *See United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106-07 (2d Cir. 2021) (describing materials extraneous to the pleadings that courts may consider on a motion to dismiss).

that recited a remote, home-based position, for which there was a preference that applicants live in or near New York City.  (Compl. ¶¶ 32-36).  The Offer Letter for each Plaintiff was substantively the same, setting forth a base salary of $120,000 per year plus commissions, bonuses, stock options, and other benefits.  (Offer Letters; Compl. ¶ 38).  Section 9 of each Offer Letter also contained the following arbitration provision:

> Any controversy between the parties involving this Agreement, or any other Agreement between the parties and/or affiliate entities, shall be submitted to arbitration in the State of Delaware, on the request of either party.  Any such arbitration shall comply with and be governed by the provisions of the Commercial Arbitration Rules of the American Arbitration Association ["AAA"] or such other arbitrator or rules as may be unanimously agreed to.

(Offer Letters § 9).

After several months of work, none of the Plaintiffs had received any pay. (Compl. ¶¶ 37, 39).  As late as October and November of 2020, Defendant Harris — on behalf of Harris Partners — continued to refer to Plaintiffs as the "sales team" and promised that back pay would be forthcoming.  (*Id.* ¶ 37). Ultimately, Plaintiffs received nothing.  (*Id.* ¶ 39).

## B.    Procedural Background

Plaintiffs filed their Complaint on August 31, 2021, making claims under the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. §§ 201-219, and the New

---

For ease of reference, the Court refers to Plaintiffs' memorandum of law in support of their motion to strike and to dismiss "Pl. Br." (Dkt. #51); to Defendant's response in opposition and motion to dismiss as "Def. Opp." (Dkt. #62); and to Plaintiffs' reply brief as "Pl. Reply" (Dkt. #66).

York Labor Law (the "NYLL"), N.Y. Lab. Law §§ 190-199-a, 650-665, as well as common-law claims for conversion, breach of contract, and unjust enrichment. (Dkt. #1).  Upon Plaintiffs' request, the Court extended the deadline for service several times.  (*See, e.g.*, Dkt. #14, 16, 19).  On March 23, 2022, the Court received Defendant Harris's Answer and Counterclaims, which purported to include as well a motion to dismiss based on arbitration provisions in Plaintiffs' employment agreements.  (Dkt. #20).  As relevant here, Defendant, proceeding *pro se*, asserted counterclaims against each Plaintiff for (i) fraud, and conspiracy to commit same, in connection with each Plaintiff's submission of activity reports; (ii) tortious interference with contractual relationships, and conspiracy to commit same, arising from certain contacts with prospective customers; and (iii) attempted extortion and conspiracy to commit extortion in the form of "threaten[ing] Defendants with adverse consequences unless [each Plaintiff] obtained financial compensation that was not otherwise payable."  (*Id.* at 2-4).  Defendant sought millions of dollars in compensatory and punitive damages from each Plaintiff.  (*Id.*).

In May 2022, Defendant filed a motion requesting a period of time to secure legal representation before proceedings in this matter continued.  (Dkt. #36).  The Court granted the motion, as well as several requests for additional time on that basis.  (*See* Dkt. #37 (order granting motion); *see also* Dkt. #40-43 (additional requests and orders)).  Defendant was unable to secure counsel, and an initial pretrial conference was therefore held with Plaintiffs and *pro se* Defendant Harris on May 10, 2023.  (Minute Entry for May 10, 2023).

4

Separately, Plaintiffs obtained certificates of default for the two Harris Partners entities.  (Dkt. #48-49).

On August 1, 2023, Plaintiffs filed their motion to dismiss Defendant's counterclaims, to deny Defendant's motion to dismiss the Complaint in favor of arbitration, and to strike Defendant's answer.  (Dkt. #51).  On January 17, 2024, the Court received Defendant's response to the motion, in which he argued that: (i) Plaintiffs' disputes were required to be submitted to arbitration; (ii) constitutional due process concerns foreclosed dismissal of his Answer; and (iii) discovery would show a basis for Defendant's counterclaims.  (Dkt. #62). On March 1, 2024, Plaintiffs filed their reply submission.  (Dkt. #66).

## DISCUSSION

### The Court Denies Defendant's Motion to Compel Arbitration, But Grants Defendant's Motion to Stay the Case Pending Arbitration

Before addressing Plaintiffs' arguments for dismissal and striking of allegations, the Court must first consider Defendant Harris's argument that all of Plaintiffs' claims are subject to an arbitration provision contained in each Plaintiff's Offer Letter.  That is because, to the extent that Defendant is correct and some or all of the claims must be resolved in arbitration, the Court will then have to consider whether to stay the remainder of the case pending that arbitration.

Because Defendant Harris is proceeding *pro se*, the Court construes his submissions liberally, to raise the strongest arguments they can support.  *See Triestman* v. *Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006); *see also Tracy* v. *Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010) (observing that the

solicitude afforded to *pro se* litigants can take a variety of forms, including liberal construction of papers, "relaxation of the limitations on the amendment of pleadings," leniency in the enforcement of other procedural rules, and "deliberate, continuing efforts to ensure that a *pro se* litigant understands what is required of him" (citations omitted)).  As relevant to the analysis in this section of the Opinion, the Court construes Defendant's motion to dismiss to include a motion to compel arbitration of Plaintiffs' claims pursuant to Section 4 of the Federal Arbitration Act (the "FAA"), and in the alternative for a stay of this action pursuant to Section 3 of the FAA pending the completion of arbitration proceedings.  For the reasons set forth in the remainder of this Opinion, the Court denies Defendant's motion to compel arbitration, grants Defendant's motion to stay this action pending arbitration proceedings, and denies as moot Plaintiffs' motions to strike and to dismiss.

**A.      The Court Lacks the Ability to Compel an Arbitration in Delaware**

Before determining whether the parties' disputes can be arbitrated, the Court first considers the scope of its authority in this area.  The FAA, 9 U.S.C. §§ 1-16, "reflects a liberal federal policy favoring arbitration agreements and places arbitration agreements on the same footing as other contracts." *Meyer* v. *Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (internal quotation marks and citations omitted).  Section 4 of the FAA allows a party to such an agreement to petition a district court for an order compelling arbitration where a counterparty "fail[s], neglect[s], or refus[es] ... to arbitrate" under the terms of an arbitration agreement.  9 U.S.C. § 4.  Of note, however, Section 4 provides a

6

court with the authority to compel arbitration only within the district in which the motion to compel arbitration is filed.  *Id.* ("The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed.").

As noted, the Offer Letters in this case contain an arbitration provision that requires any arbitration to be filed in Delaware.  (Def. Opp., Ex. 2-4 (Offer Letters)).  As a preliminary matter, therefore, even assuming that there are valid and enforceable arbitration provisions in the Offer Letters, this Court lacks the ability to compel Plaintiffs to arbitrate their employment-related disputes with Defendant in Delaware.  As other courts in this District have noted, Section 4 of the FAA "paradoxically empowers district courts to 'direct[ ] that such arbitration proceed in the manner provided' in an agreement, but with the caveat that the 'hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed.'"  *Robinson* v. *Ent. One US LP*, No. 14 Civ. 1203 (AJN), 2015 WL 3486119, at *4 (S.D.N.Y. June 2, 2015) (citing 9 U.S.C. § 4) (collecting cases); *see also L. Offs. of Joseph L. Manson III* v. *Keiko Aoki*, No. 19 Civ. 4392 (LTS) (GWG), 2020 WL 767466, at *3 (S.D.N.Y. Jan. 3, 2020) ("Although the Second Circuit has not decided the question of whether Section 4 precludes a district court from compelling arbitration outside of its district, persuasive decisions in this Circuit have routinely held that it does." (collecting cases)).  Instead, these courts have considered whether the parties' disputes are otherwise "referable to arbitration" in another district pursuant to FAA Section

3, such that the federal litigation should be stayed pending such an arbitration. *See, e.g.*, *DaPuzzo* v. *Globalvest Mgmt. Co., L.P.*, 263 F. Supp. 2d 714, 739 (S.D.N.Y. 2003) ("Where a federal court lacks authority pursuant to 9 U.S.C. § 4 to compel arbitration outside its district, the court may still determine that the dispute nonetheless remains 'referable to arbitration' elsewhere, if a forum is designated, and must then order a stay instead, thereby leaving the parties free to pursue their contractual rights and remedies in the appropriate venue."). The Court considers these alternative arguments in the following section.

## B.     The Court Will Stay This Action Pending Arbitration

### 1.     Determining Whether a Claim Is "Referable to Arbitration"

The Court next proceeds to consider the degree to which the parties' claims are subject to arbitration and, concurrently, whether a stay of this litigation would be appropriate. On the latter point, Section 3 of the FAA provides that "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration," the Court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3; *see also Katz* v. *Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015) (The FAA "mandate[s] a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested."); *cf. Bissonnette* v. *LePage Bakeries Park St., LLC*, 49 F.4th 655, 664 (2d Cir. 2022) (Jacobs, J., concurring) ("*Katz* construed Section 3 of the FAA to mandate a stay when 'all claims have been referred to

arbitration and a stay requested.'  However, the FAA mandates a stay whether or not a party requests one." (internal citation omitted)), *cert. granted*, 144 S. Ct. 479 (2023).

In determining whether a particular dispute is arbitrable, a court must consider: (i) whether the parties agreed to arbitrate, and, if so, (ii) whether the scope of that agreement encompasses the claims at issue.  *See Holick* v. *Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015) (internal quotation marks and citations omitted); *see also Zachman* v. *Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101 (2d Cir. 2022) ("In deciding whether to compel arbitration, a court must first decide whether the parties agreed to arbitrate. Only if the court concludes an agreement to arbitrate exists does it determine (1) the scope of the agreement to arbitrate; (2) whether Congress intended any federal statutory claims asserted to be non-arbitrable; and (3) if some, but not all, of the claims in the case are arbitrable, whether to stay the balance of the proceedings pending arbitration." (citing *Spear, Leeds & Kellogg* v. *Cent. Life Assur. Co.*, 85 F.3d 21, 25 (2d Cir. 1996); *JLM Indus., Inc.* v. *Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004))).

In this setting, the district court applies a "standard similar to that applicable for a motion for summary judgment."  *Meyer*, 868 F.3d at 74 (internal quotations omitted).  "[T]he court considers all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and draws all reasonable inferences in favor of the non-moving party."  *Id.* (internal

quotation marks, alterations, and citations omitted).   "If there is an issue of
fact as to the making of the agreement for arbitration, then a trial is
necessary."  *Bensadoun* v. *Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (citing
9 U.S.C. § 4).   However, a party may not defeat a motion to compel arbitration
through "general denials of the facts on which the right to arbitration depends."
*Oppenheimer & Co., Inc.* v. *Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995).   In other
words, "[i]f the party seeking arbitration has substantiated the entitlement by a
showing of evidentiary facts, the party opposing may not rest on a denial but
must submit evidentiary facts showing that there is a dispute of fact to be
tried."  *Id.* (collecting cases).

### 2. Determining Whether the Parties Have Agreed to Arbitrate

#### a. Agreement Formation Under New York Law

The issue of whether the parties have agreed to arbitrate is determined
under state law.  *See First Options of Chicago, Inc.* v. *Kaplan*, 514 U.S. 938, 944
(1995); *Bell* v. *Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002) ("Because an
agreement to arbitrate is a creature of contract ... the ultimate question of
whether the parties agreed to arbitrate is determined by state law.").   While the
Offer Letters recite Delaware as the situs of any arbitration, they contain no
choice-of-law provision.   (*See* Offer Letters).   Accordingly, the Court will apply
New York choice-of-law rules.   *See Follman* v. *World Fin. Network Nat'l Bank*,
721 F. Supp. 2d 158, 161 (E.D.N.Y. 2010) ("To determine which state's law to
apply to the issue of contract formation, a federal court sitting with federal
question jurisdiction looks to the choice-of-law doctrine of the forum state[.]"),

*cited in Levy* v. *Credit Plus, Inc.*, No. 21 Civ. 5541 (KMK), 2023 WL 2644352, at *5 (S.D.N.Y. Mar. 27, 2023); *accord Royal & Sun All. Ins., PLC* v. *E.C.M. Transp., Inc.*, No. 14 Civ. 3770 (JFK), 2015 WL 5098119, at *4 (S.D.N.Y. Aug. 31, 2015) (collecting cases).

"[I]n the absence of a choice-of-law provision, New York applies a 'center of gravity' approach to contract cases[.]" *Fleetwood Servs., LLC* v. *Ram Cap. Funding, LLC*, No. 20 Civ. 5120 (LJL), 2022 WL 1997207, at *15 (S.D.N.Y. June 6, 2022) (citation omitted). "In adjudicating the choice of law for a contract dispute, the New York Court of Appeals looks to 'five generally significant contacts': 'the place[s] of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties.'" *United States* v. *Moseley*, 980 F.3d 9, 23 (2d Cir. 2020) (quoting *Matter of Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 227 (1993)). "The traditional choice of law factors — the places of contracting and performance — are given heavy weight in this analysis." *Id.* (citation omitted); *see also Fleetwood Servs., LLC*, 2022 WL 1997207, at *15.

From the facts currently before the Court, New York would seem to be the "center of gravity," inasmuch as it is the place of contracting, negotiation, and performance for two of the three Plaintiffs and the office address for the Harris Partners entities. (*See* Compl. ¶¶ 10, 14, 28, 29, 33). Unfortunately, the parties have not adequately briefed the question of which state's law applies. Defendant Harris suggests that Delaware supplies the applicable law, but his argument appears to be premised on a misperception that the

arbitration provision in the Offer Letters is in fact a choice-of-law provision. (Def. Opp. 1-2). Plaintiffs argue that New York law applies to their non-FLSA claims (Pl. Br. 8; Pl. Reply 1), but do not address the applicability *vel non* of any other state's laws.

Where, as here, the parties have failed to brief the question, "[d]eclining to engage in a choice of law analysis is especially appropriate." *Walker* v. *Thompson*, 404 F. Supp. 3d 819, 823 n.3 (S.D.N.Y. 2019). As it happens, however, the Court need not make a choice-of-law determination for another reason. The Court's independent analysis has identified no substantive differences between the laws of Delaware and New York on the issue of contract formation. "[B]ecause under both states' regimes, the applicable legal principles are aligned," a choice-of-law analysis is unnecessary. *MBIA Inc.* v. *Fed. Ins. Co.*, 652 F.3d 152, 158 (2d Cir. 2011) (discussing New York and Connecticut law); *see also Flores* v. *Chime Fin., Inc.*, No. 21 Civ. 4735 (RA), 2022 WL 873252, at *4 (S.D.N.Y. Mar. 23, 2022) ("The Court finds that there is no actual conflict between New York, Delaware, or California contract law on the question of whether parties have assented to a contract." (collecting cases)); *Kulig* v. *Midland Funding, LLC*, No. 13 Civ. 4715 (PKC), 2013 WL 6017444, at *4 (S.D.N.Y. Nov. 13, 2013) ("Although the record as it stands indicates that New York law likely applies to the issue of contract formation [for purposes of resolving motion to compel arbitration], the Court needs not resolve this issue because the same result would follow under the law of either [New York or Delaware].").

12

Under New York law, the party seeking arbitration must prove by a preponderance of the evidence that a valid arbitration agreement exists. *Progressive Cas. Ins. Co.* v. *C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993); *see also* N.Y. C.P.L.R. § 7501 ("A written agreement to submit any controversy thereafter arising or any existing controversy to arbitration is enforceable without regard to the justiciable character of the controversy and confers jurisdiction on the courts of the state to enforce it and to enter judgment on an award."). A valid arbitration agreement requires "a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement[.]" *In re Express Indus. & Terminal Corp.* v. *N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999). By signing a written instrument, a party creates presumptive evidence of its assent to enter into a binding agreement. *See, e.g.*, *Gold* v. *Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004); *Gillman* v. *Chase Manhattan Bank*, 73 N.Y.2d 1, 11 (1988) (holding that a party's signature generally creates a presumption that the party assented to the terms of the agreement).

Plaintiffs Schatzmann and Messina each signed the Offer Letter containing the arbitration provision, which suggests as to those two Plaintiffs that a valid arbitration agreement existed. (Def. Opp., Ex. 3-4). In contrast, neither side has produced a signed version of Plaintiff Lezotte's Offer Letter. (*Id.*, Ex. 2). The omission is not fatal; courts have consistently interpreted New York Civil Practice Law and Rules § 7501 "to require that an agreement to

13

arbitrate be in writing but not necessarily be signed by the party to be bound." *Nat'l City Golf Fin.* v. *Higher Ground Country Club Mgmt. Co., LLC*, 641 F. Supp. 2d 196, 203 (S.D.N.Y. 2009) (collecting cases); *see also Genesco, Inc.* v. *T. Kakiuchi & Co.*, 815 F.2d 840, 845 (2d Cir. 1987) ("[I]t is well-established that a party may be bound by an agreement to arbitrate even absent a signature."), *abrogated on other grounds by Katz*, 794 F.3d 341; *God's Battalion of Prayer Pentecostal Church, Inc.* v. *Miele Assoc. LLP*, 6 N.Y.3d 371, 373-74 (2006) ("[A]n arbitration clause in a written agreement is enforceable, even if the agreement is not signed, when it is evident that the parties intended to be bound by the contract.").

Because the agreement is unsigned, the Court looks to the parties' intent to determine the arbitration provision's validity. *See Flores* v. *Lower E. Side Serv. Ctr., Inc.*, 4 N.Y.3d 363, 368 (2005). Here, Plaintiff Lezotte indicated his intention to be bound to the terms of the Offer Letter, including its arbitration provision, when he began his employment with Harris Partners. Indeed, Plaintiffs' claims for unpaid wages are predicated on the compensation provisions of the Offer Letters; having brought litigation to recover pursuant to that portion of the Offer Letters, it is only fair that Plaintiffs be bound to all of their terms.[3]

---

[3]     Plaintiffs also note that no one appears to have signed the Offer Letters on behalf of Defendants. (Pl. Reply 3). As a factual matter, the Court understands that the copies of the Offer Letters submitted with the motions were those in Plaintiffs' possession, and that Defendant Harris's current incarcerated status forecloses his ability to access any countersigned versions that may exist. As a legal matter, "[i]t is well established that an arbitration agreement need not be signed by an employer to be enforceable against the employee." *Davis* v. *Crothall Healthcare, Inc.*, No. 22 Civ. 7196 (PGG) (SDA), 2023 WL

### b.      Plaintiffs' Challenges to the Arbitration Provision

As an alternative to their claim that no agreement to arbitrate was formed, Plaintiffs offer a litany of challenges to the enforceability of the arbitration provision.  As discussed in the remainder of this section, all of Plaintiffs' challenges fail.

### i.      The Arbitration Provision Is Mandatory

To begin, Plaintiffs argue that this provision is "not mandatory," insofar as either party can request arbitration.  (Pl. Reply 2-3).  Such an argument, however, overlooks the plain language of the provision, which states that upon such a request, the dispute "*shall* be submitted to arbitration." (Def. Opp., Ex. 2-4 (Offer Letters) (emphasis added)).  The Court rejects the argument out of hand.

### ii.     Defendant Harris's Ability to Invoke the Arbitration Provision

Plaintiffs next contest Defendant Harris's ability to invoke the arbitration provision of an agreement that he signed, if at all, only as an officer of Harris Partners.  "[A] non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of the relationship among the parties, the contracts they signed …, and the issues that had arisen among them discloses that the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Ragone* v. *Atl. Video at Manhattan Ctr.*, 595 F.3d

---

6519603, at *5 (S.D.N.Y. July 7, 2023) (collecting cases), *report and recommendation adopted*, No. 22 Civ. 7196 (PGG) (SDA), 2023 WL 6237845 (S.D.N.Y. Sept. 26, 2023).

115, 126-27 (2d Cir. 2010); *accord JLM Indus.*, 387 F.3d at 177.[4]  As a sister

court in this District recently explained:

> Turning to a non-signatory's ability to compel arbitration under the doctrine of equitable estoppel, the Court must make a two-part inquiry.  First, "the relationship among the parties, the contracts they signed ..., and the issues that had arisen" must reveal that the dispute the non-signatory seeks to compel is "intertwined" with the agreement to arbitrate.  *See Ragone* v. *Atlantic Video at Manhattan Ctr.*, 595 F.3d 115, 126-27 (2d Cir. 2010) (citing *Choctaw Generation Ltd. P'ship* v. *Am. Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001)).  Second, there must be a relationship among the parties that justifies permitting a non-signatory to stand in for a signatory and compel arbitration under the agreement.  *Id.* at 127.

*Interactive Brokers LLC* v. *Delaporte*, No. 23 Civ. 5555 (NRB), 2023 WL

6795419, at *3 (S.D.N.Y. Oct. 13, 2023).

In the instant case, the two inquiries are answered in the affirmative.  All

of Plaintiffs' claims, and by extension all of the claims as to which Defendant

Harris seeks arbitration, concern the work that Plaintiffs performed, and the

compensation to which they were entitled, pursuant to the Offer Letters

Plaintiffs executed with the Harris Partners entities Defendant controlled.

These issues are "intertwined" with the arbitration provision in the Offer

Letters, which provision by its terms applies to "[a]ny controversy between the

---

[4]    *Cf. Doe* v. *Trump Corp.*, 6 F.4th 400 (2d Cir. 2021):

> [O]ur cases which have applied estoppel against a party seeking to avoid arbitration have tended to share a common feature in that the non-signatory party asserting estoppel has had some sort of corporate relationship to a signatory party; that is, this Court has applied estoppel in cases involving subsidiaries, affiliates, agents, and other related business entities.

*Id.* at 413 (internal quotation marks and citation omitted).

16

parties involving this Agreement, or any other Agreement between the parties and/or affiliate entities." (Offer Letters). *See Doe* v. *Trump Corp.*, 453 F. Supp. 3d 634, 640 (S.D.N.Y. 2020) ("The Second Circuit has not specified the minimum quantum of intertwined-ness required to support a finding of estoppel. Intertwined-ness depends on how related the factual issues of the claims are to the subject matter of the arbitration agreements." (internal quotation marks and citations omitted)), *aff'd*, 6 F.4th 400 (2d Cir. 2021).

In addition, Plaintiffs acknowledge that Defendant Harris was "the chairman and/or CEO of these entities" during the relevant time period. (Compl. ¶ 15). That relationship justifies allowing Defendant Harris to invoke the arbitration provisions in the Offer Letters. *See City of Almaty, Kazakhstan* v. *Sater*, No. 19 Civ. 2645 (AJN) (KHP), 2019 WL 6681560, at *9 (S.D.N.Y. Dec. 6, 2019) ("New York permits corporate officers and employees to enforce arbitration agreements entered into by their corporation in certain circumstances." (collecting cases where courts have allowed non-signatory officers to invoke provisions of arbitration agreement signed by corporation "to the extent that the alleged misconduct relates to their behavior as officers or directors or in their capacities as agents of the corporation")), *objections overruled sub nom. City of Almaty* v. *Sater*, No. 19 Civ. 2645 (AJN), 2021 WL 4940304 (S.D.N.Y. Oct. 22, 2021).

The curveball here, of course, is that Defendant Harris used his birth name, and not his legal name, in his dealings with Plaintiffs. Perhaps unsurprisingly, the Court has found little caselaw on point. In *Williams Fund*

17

*Priv. Equity Grp., Inc.* v. *Ross* ("*Williams Fund*"), No. 05 Civ. 3166 (BBM), 2006 WL 8432859 (N.D. Ga. May 17, 2006), the parties entered into a transaction by which the defendant would sell his stock in a recreational vehicle dealership and then be hired by the plaintiff as an employee of that dealership; the agreement by which the transaction was memorialized (the "Agreement") included an arbitration provision. *Id.* at *1. The plaintiff claimed that after the transaction closed, the defendant failed to turn over the stock. Worse yet, the plaintiff claimed to have discovered undisclosed problems with the dealership. *Id.* The defendant purported to rescind the transaction, and the plaintiff moved to compel arbitration in federal court. *Id.* at 2.

The defendant in *Williams Fund* argued that the Agreement and its arbitration clause "should be declared unenforceable insofar as it was the result of a fraudulent scheme devised by [the plaintiff] to obtain [the defendant]'s business and loot its assets." 2006 WL 8432859, at *2. In particular, the defendant claimed that an individual who approached him about the sale using the name "John Adams" was in fact Kenneth Mitan, who had both a criminal record and a prior bankruptcy filing, while one of the plaintiff's purported principals, "Frank Miller," was in fact Frank Mitan, Kenneth's father. *Id.* at n.6. The defendant asserted that had he known the truth about "John Adams," he would not have entered into the agreement.

The *Williams Fund* court analyzed the claim first as one of fraud in the inducement, which (for reasons discussed more fully *infra*) it could not consider as a basis for nullifying the arbitration provision. 2006 WL 8432859,

at *4.  It then considered the claim as one of "fraud in the factum," which it defined as "the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents."  *Id.* (quoting *Langley* v. *Fed. Deposit Ins. Corp.*, 484 U.S. 86, 93 (1987)); *see also Revak* v. *SEC Realty Corp.*, 18 F.3d 81, 91 (2d Cir. 1994) ("Fraud in the factum occurs when 'the maker [of the note] is tricked into believing that which he is signing is something other than a promissory or obligatory note.'  By contrast, fraud in the inducement consists of misrepresentations that cause the maker of the note to enter the transaction." (quoting *Generale Bank, New York Branch* v. *Choudhury*, 779 F. Supp. 306, 310 (S.D.N.Y.1991) (citations omitted))); *Kim* v. *Evergreen Adult Day Care in NY Inc.*, No. 22 Civ. 548 (AMD) (CLP), 2024 WL 989909, at *4 (E.D.N.Y. Mar. 6, 2024) (noting that party seeking to prevail on fraud in the execution claim must show "excusable ignorance of the contents of the writing" (internal citation omitted) (collecting cases)).[5]  The *Williams Fund* court rejected this theory as well, finding that (i) while Adams/Mitan might have misrepresented his name, he did not misrepresent the "true nature or contents" of the Agreement; and (ii) whether Adams/Mitan was authorized to sign the Agreement on behalf of the plaintiff "had nothing to do with [the defendant's] assent to the same."  2006 WL 8432859, at *4; *cf. Jordan* v. *Comcast Cable*

---

[5]      Courts in this Circuit sometimes refer to this concept as "fraud in the execution."  *See, e.g.*, *Kim* v. *Evergreen Adult Day Care in NY Inc.*, No. 22 Civ. 548 (AMD) (CLP), 2024 WL 989909, at *4 (E.D.N.Y. Mar. 6, 2024); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 163 cmt. a (1981) (explaining that fraud in the execution occurs where there is a "misrepresentation as to the character or essential terms of a proposed contract" and a party signs without knowing or having a "reasonable opportunity to know of its character or essential terms").

*Commc'ns Mgmt., LLC*, No. 14 Civ. 3622 (WSD), 2016 WL 452145, at *5 (N.D. Ga. Feb. 4, 2016) (rejecting efforts to invalidate arbitration agreement based on difference between customer's maiden name and married name).

So too here.  Irrespective of the name he used, Defendant Harris was the principal of the Harris Partners entities — both duly incorporated — and was authorized as an officer to bind each company.  More importantly, for purposes of the fraud in the execution analysis, Plaintiffs have not shown that Defendant Harris misrepresented the "true nature and contents" of each Offer Letter, nor that Plaintiffs had "excusable ignorance of the contents of the writing." Accordingly, the Court will not prohibit Defendant Harris from invoking the arbitration provision based upon his use of the name "Edward P. Harris," and leaves further challenges to the Offer Letter or its arbitration provision predicated on Defendant Harris's use of the name "Edward P. Harris" to the arbitrator.

### iii.    Plaintiffs' Claims of Unconscionability

Plaintiffs also challenge the venue and fee structure provisions of the arbitration provision, which challenges the Court construes as unconscionability challenges to the provision itself, and not to the broader Offer Letter.  (Pl. Reply 3-4).[6]  Under New York law, an arbitration agreement is unconscionable if it is "so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be

---

[6]    As explained *infra*, this Court would not have the ability to hear an unconscionability claim levied against the Offer Letter as a whole.

unenforceable according to its literal terms." *Ragone*, 595 F.3d at 121 (quoting *Gillman*, 73 N.Y.2d at 10); *accord Gillman*, 73 N.Y.2d at 10 (observing that unconscionability generally requires "some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party" (internal quotation marks and citations omitted)).

A party seeking to invalidate a contractual provision on the basis of unconscionability must show that the provision was "both procedurally and substantively unconscionable when made." *Spinelli* v. *Nat'l Football League*, 903 F.3d 185, 208 (2d Cir. 2018) (quoting *Gillman*, 73 N.Y.2d at 10 (internal citations omitted)). "The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice; the substantive element looks to the content of the contract." *Ragone*, 595 F.3d at 121-22 (internal citations omitted); *accord Glover* v. *Bob's Disc. Furniture, LLC*, 621 F. Supp. 3d 442, 449 (S.D.N.Y. 2022).  Additionally, procedural and substantive unconscionability operate on a "'sliding scale'; the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa." *State* v. *Wolowitz*, 468 N.Y.S.2d 131, 145 (2d Dep't 1983).

Plaintiffs have failed to satisfy either prong of the unconscionability analysis.  On the procedural side, Plaintiffs have not alleged high-pressure tactics or threats to get them to sign or abide by the Offer Letters.  Courts interpreting New York law have found, as relevant here, that it is not

procedurally unconscionable for an employer to offer employment agreements including arbitration provisions on a "take it or leave it" basis. *See Catz* v. *Precision Glob. Consulting*, No. 19 Civ. 7499 (ER), 2021 WL 1600097, at *6 (S.D.N.Y. Apr. 23, 2021). And while there may have been deception by Defendant Harris with respect to his legal name, the terms of the employment relationship and the mode of resolving disputes in that relationship were clearly laid out.

On the substantive side, courts have found that "an arbitration provision that equally binds both parties to arbitration — as does the arbitration provision here — is not substantively unconscionable." *Catz*, 2021 WL 1600097, at *6 (collecting cases); *see also Suqin Zhu* v. *Hakkasan NYC LLC*, 291 F. Supp. 3d 378, 391-92 (S.D.N.Y. 2017) ("An agreement is substantively unconscionable only 'if it is so grossly unreasonable as to be unenforceable according to its literal terms and those contract terms are unreasonably favorable to the party seeking to enforce the contract.'" (internal citation omitted)). The Court observes from the record in this case that (i) participating in a Delaware arbitration would not appear to be unconscionable where two of the three Plaintiffs reside in New York and brought this litigation in New York, and (ii) Plaintiffs have presented no evidence of their financial circumstances that would suggest that the AAA fee-splitting protocols of the Commercial Rules would be substantively unconscionable as applied to them. *See Am. Fam. Life Assurance Co. of N.Y.* v. *Baker*, 778 F. App'x 24, 27 (2d Cir. 2019) (summary order) ("New York courts have rejected the proposition that cost-splitting

provisions are *per se* unconscionable, instead holding that the issue of a litigant's financial ability is to be resolved on a case-by-case basis."); *Guan* v. *Uber Techs., Inc.*, 236 F. Supp. 3d 711, 733 (E.D.N.Y. 2017) (declining to find substantive unconscionability where plaintiffs failed to show that they "would be prevented from arbitrating a claim that they could otherwise afford to pursue in court").

### iv.   Plaintiffs' Claims of Waiver

Plaintiffs argue that Defendant Harris has waived his right to arbitration of the parties' disputes because of his decision to file counterclaims in this Court, rather than raising them in an arbitral forum in the first instance.  (Pl. Reply 3).  As an initial matter, the argument is illogical, as Defendant's counterclaims only came to the fore as a result of Plaintiffs' decision to bring claims for compensation and related damages.

More pointedly, however, the facts alleged fail to qualify as a waiver.  The waiver analysis considers "whether [a party's] conduct evinced a knowing relinquishment of its arbitration rights."  *Billie* v. *Coverall N. Am. Inc.*, No. 22-718-cv, 2023 WL 2531396, at *3 n.3 (2d Cir. Mar. 15, 2023) (summary order). The party resisting enforcement of the arbitration provision bears the burden of showing waiver.  *In re Generali COVID-19 Travel Ins. Litig.*, 577 F. Supp. 3d 284, 293 (S.D.N.Y. 2021).

In the wake of the Supreme Court's decision in *Morgan* v. *Sundance, Inc.*, 596 U.S. 411, 414 (2022), which rejected a prejudice component in the waiver inquiry, courts in this Circuit have not been perfectly consistent as to the

proper components of such an inquiry.  *See Brevard* v. *Credit Suisse*, No. 23 Civ. 428 (LJL), 2024 WL 36991, at *8 & n.5 (S.D.N.Y. Jan. 3, 2024) (discussing differing approaches).  At the very least, courts still consider the amount of time elapsed and the degree to which litigation has progressed as factors indicative of waiver.  *See id.* at *8 (citing, *e.g.*, *Nicosia* v. *Amazon.com, Inc.*, No. 21-2624-cv, 2023 WL 309545, at *4 n.2 (2d Cir. Jan. 19, 2023) (summary order)); *see also Alvarez* v. *Experian Info. Sols., Inc.*, 661 F. Supp. 3d 18, 29 (E.D.N.Y. 2023) ("Applying the Second Circuit's arbitration waiver test — however without the prejudice element as the Supreme Court has now said not to do — would lead the Court to consider the following: (1) how much time passed from commencement of litigation to that party's request to arbitrate? and (2) what litigation — quality and quantity — such as discovery and motion practice has taken place?" (citing *La. Stadium* & *Exposition Dist.* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 159 (2d Cir. 2010))).

In the instant matter, Defendant Harris invoked the arbitration provision in his first filing with the Court (Dkt. #20), which was submitted shortly after he was served with the Complaint in this case, and has never varied from his position that arbitration is appropriate.  Minimal discovery has been exchanged, and the case is still in its infancy.  On this record, Plaintiffs have failed to demonstrate waiver.

### v.    Plaintiffs' Remaining Challenges to the Arbitration Provision

Plaintiffs offer other reasons why this Court should nonetheless decline to enforce the arbitration provision, including arguments regarding Defendant

Harris's unclean hands.  (Pl. Reply 1-3).[7]  The Second Circuit has cautioned district courts that "challenges to a contract containing an arbitration clause fall into two categories: those that challenge the contract as a whole, and those that challenge the arbitration clause in particular."  *Ipcon Collections LLC* v. *Costco Wholesale Corp.*, 698 F.3d 58, 61 (2d Cir. 2012).  Where the challenge is to "the arbitration clause itself — an issue which goes to the making of the agreement to arbitrate — the federal court may proceed to adjudicate it." *Buckeye Check Cashing, Inc.* v. *Cardegna*, 546 U.S. 440, 445 (2006).  However, the FAA "does not permit the federal court to consider" broader challenges to the contract generally.  *Id.*  Put somewhat differently, "a party's challenge to another provision of the contract [besides the arbitration clause], or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate."  *Rent-A-Center, W., Inc.* v. *Jackson*, 561 U.S. 63, 70 (2010); *see also, e.g.*, *Inventory Generation Inc.* v. *Proventure Cap. Funding LLC*, No. 22 Civ. 10529 (PAE), 2023 WL 2609344, at *6 (S.D.N.Y. Mar. 23, 2023) ("Given the nature of Inventory Generation's challenges to the Agreement as criminally usurious, fraudulently induced, unconscionable, and illegal, these challenges are, therefore, properly evaluated in the first instance by an arbitrator.").

Plaintiffs suggest that the arbitration provisions of the Offer Letters are void, or voidable, as a consequence of Defendants' failure to "perform[ ] the

---

[7]    To the extent that any of Plaintiffs' challenges discussed *supra* were meant to cover the Offer Letter in its entirety, and not merely its arbitration provision, this section provides the appropriate framework for such challenges.

most essential aspect of the employment contract — paying the Plaintiffs any wages at all as promised, in return for their work performed." (Pl. Reply 1). In so arguing, however, Plaintiffs are in fact challenging the enforceability of the entire agreement, and not merely its arbitration provision. (*See id.* at 2 ("As a matter of basic contract law and equity, Defendants' failure to honor their side of the contract means that Plaintiffs are discharged from any and all obligations thereunder as well.")). This Court cannot consider such a challenge; an arbitrator can.

### 3. Determining the Scope of Arbitrability

In accordance with the "strong federal policy favoring arbitration as an alternative means of dispute resolution," a court must resolve any doubts concerning the scope of arbitrable issues "in favor of arbitrability." *Daly* v. *Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (quoting *State of N.Y.* v. *Oneida Indian Nation of N.Y.*, 90 F.3d 58, 61 (2d Cir. 1996)), *cert. denied*, 140 S. Ct. 1117 (2020). In so doing, courts "will compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* (internal quotation marks and citation omitted). The Second Circuit has made clear that under the FAA, "threshold questions of arbitrability presumptively should be resolved by the courts," but that such a "presumption may be overcome where the parties 'clearly and unmistakably' agree to arbitrate threshold questions such as whether the arbitration clause applies to a particular dispute, or whether it is

enforceable[.]" *Doctor's Assocs., Inc.* v. *Alemayehu*, 934 F.3d 245, 250-51 (2d Cir. 2019).

The Court has already discussed, and rejected, Plaintiffs' claim that the arbitration provision in the Offer Letters is not mandatory. (Pl. Reply 2-3). Apart from that, Plaintiffs do not seriously contest that their employment-related claims fall within the scope of the provision, which by its terms covers "[a]ny controversy between the parties involving this Agreement, or any other Agreement between the parties and/or affiliate entities," and that the entirety of their Complaint is thus arbitrable. (Offer Letters § 9).

Even if Plaintiffs contested arbitrability, the arbitration provision in the Offer Letters specifically incorporates AAA's Commercial Arbitration Rules, which provide in relevant part:

> (a)    The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.

> (b)    The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

American Arbitration Association, *Commercial Arbitration Rules and Mediation Procedures*, Rule 7 (amended and effective Oct. 1, 2013). The Second Circuit has explicitly found that incorporation of such rules demonstrates the parties' agreement that issues of arbitrability are the province of the arbitrator. *See,*

*e.g.*, *Olin Holdings Ltd.* v. *Libya*, 73 F.4th 92, 105 (2d Cir. 2023) ("When 'parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.'" (citation omitted)); *Contec Corp.* v. *Remote Sol. Co., Ltd.*, 398 F.3d 205, 208-11 (2d Cir. 2005) (holding that adoption of the AAA Commercial Rules delegated arbitrability determinations to the arbitrator).

### 4.     Congress Intended FLSA Claims to Be Arbitrable

Having found an agreement to arbitrate, the Court considers whether Congress intended any federal statutory claims to be non-arbitrable. *See Zachman*, 49 F.4th at 101 (citing *JLM Indus.*, 387 F.3d at 169). The parties do not address the issue, but the Second Circuit has previously found that FLSA claims are arbitrable, and this Court concludes similarly here. *See, e.g.*, *Depena* v. *Parts Auth., Inc.*, 877 F.3d 122, 123 (2d Cir. 2017) (holding that FLSA claims are arbitrable); *Sutherland* v. *Ernst & Young LLP*, 726 F.3d 290, 297 (2d Cir. 2013) (holding "the FLSA does not include a 'contrary congressional command' that prevents the underlying arbitration agreement from being enforced by its terms"); *Arrigo* v. *Blue Fish Commodities, Inc.*, 704 F. Supp. 2d 299, 304 (S.D.N.Y. 2010) ("The Court therefore concludes that Congress did not intend FLSA claims to be non-arbitrable."), *aff'd*, 408 F. App'x 480 (2d Cir. 2011) (summary order).

### 5.    The Court Will Stay the Matter Pending Arbitration

As noted much earlier in this Opinion, despite finding that all of Plaintiffs' claims are potentially subject to arbitration, the Court lacks the ability to compel an arbitration in Delaware, as specified by the arbitration provision.  However, this does not mean that Defendant Harris must continue with this lawsuit.  Section 3 of the FAA provides that "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration," the Court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3; *see also Katz*, 794 F.3d at 347 (The FAA "mandate[s] a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested.").  This Court has interpreted Defendant's claims to include an alternative request for a stay pursuant to Section 3.  The Court can neither dismiss the action nor compel an arbitration in accordance with the arbitration provision.  It can and will, however, stay this matter pending arbitration.[8]

---

[8]    The Court pauses to note that it takes seriously Defendant Harris's statements of his intent to pursue resolution of these claims in arbitration, and does not believe that Defendant is merely seeking to delay or subvert this litigation.  If Defendant does not timely and diligently pursue arbitration of these claims, however, the Court will consider arguments that he has waived any right he may have to arbitrate these claims. *See supra*, B.2.b.iv.

## CONCLUSION

For the foregoing reasons, the Court DENIES Defendant Harris's motions to dismiss and to compel, GRANTS Defendant's motion to stay, and denies as moot Plaintiffs' motion to strike or to dismiss.  The Clerk of Court is directed to terminate the motion at docket entry 51, and to STAY this case pending further order of the Court while the parties arbitrate their disputes.  The parties are directed to submit a joint status letter on or before the earlier of **September 30, 2024**, or their receipt of a decision from the arbitrator.

The Clerk of Court is directed to mail a copy of this Opinion and Order to Defendant's address of record:

> Edward Harris a/k/a David Wagner
> Reg. No. 12143-070
> FCI Cumberland
> Federal Correctional Institution Satellite Camp
> P.O. Box 1000
> Cumberland, MD 21501

SO ORDERED.

Dated:   March 22, 2024
        New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge